**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**CERTAIN UNDERWRITERS AT
LLYOD'S, LONDON Subscribing to
policy SPAPL-000001-935,**

        **Plaintiff,**                                           **22-CV-14 (WMS)(HKS)**

    **v.**

**ALLIED PROFESSIONALS INSURANCE
COMPANY, A RISK RETENTION
GROUP, INC., an Arizona corporation,**

        **Defendant.**

---

## DECISION AND ORDER

This case was referred to the undersigned by United States District Judge William M. Skretny for all pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A). Dkt. 9.

Plaintiff Certain Underwriters at Lloyd's, Subscribing to policy SPAPL-000001-935, filed a complaint against Defendant Allied Professionals Insurance Company, A Risk Retention Group, Inc. ("Allied") (Dkt. 1). Plaintiff alleges that Allied breached its obligation to defend and indemnify their mutual insured, Vitality, in an underlying personal injury action. *Id.* at ¶ 1. Allied moves to compel arbitration and stay this action, or, in the alternative, transfer the case (Dkt. 11). Plaintiff opposed (Dkt. 17), and Defendant replied (Dkt. 18). The Court heard oral argument on June 27, 2023. Dkt. 24. For the reasons that follow, Allied's motion to compel arbitration is DENIED.

## BACKGROUND

### I.    THE COMPLAINT

Plaintiff is a voluntary association of insurance underwriters, each with liability for its own proportionate share of the risk underwritten by them, and not jointly or for one another. Dkt. 1, at ¶ 2.

Plaintiff alleges that it issued a professional liability policy to Vitality, effective January 30, 2015 to January 30, 2016.[1] *Id.* at ¶ 3. On May 17, 2016, Eileen Chiodo commenced a personal injury action against Vitality (the "Underlying Action"). *Id.* at ¶ 8. In her amended complaint, Chiodo also named Katie Goranova as a defendant in the Underlying Action. *Id.* at ¶ 9. Chiodo alleged that Vitality operates a Massage Envy franchise located at 3670 McKinley Parkway, Hamburg, New York. *Id.* at ¶ 10. Chiodo further alleged that on December 11, 2014, Katia Goranova—a Vitality employee— negligently, unskillfully and carelessly performed a massage treatment on her at the Massage Envy franchise, resulting in serious permanent injuries. *Id.* at ¶¶ 11–12.

Plaintiff provided Vitality with a defense and settled the Underlying Action. *Id.* at ¶¶ 13–14. Under the terms of the settlement agreement, Plaintiff paid the entire amount of the settlement. *Id.* at ¶ 16. According to Plaintiff, the amount of the settlement was reasonable in light of Vitality's potential liability for Goranova's actions and the seriousness of the injuries Chiodo allegedly sustained. *Id.* at ¶ 15.

Allied issued a Massage Professional and General Liability Insurance Policy to Goranova, effective October 21, 2014 to October 21, 2015 (the "Allied Policy"). *Id.* at ¶ 18. The Allied Policy lists "Massage Envy-Hamburg/Orchard Park" as an additional

---

[1] Plaintiff has not provided a copy of its insurance contract at issue here.

insured. *Id.* at ¶ 19. Plaintiff alleges that Vitality qualifies as an insured or additional insured under the Allied Policy. *Id.* at ¶ 21. Plaintiff and Vitality timely tendered Vitality's defense and indemnity of the Underlying Action to Allied and demanded that Allied assume its responsibilities and obligations to Vitality. *Id.* at ¶ 22. Plaintiff further claims that Allied wrongfully refused to defend and indemnify Vitality by failing to provide sufficient grounds, or any grounds, for its refusal. *Id.* at ¶¶ 23–24. Thus, Plaintiff seeks "a declaration that Allied had a duty to defend and indemnify Vitality in the Underlying Action on a primary and noncontributory basis." *Id.* at ¶ 26.

According to Plaintiff, due to Allied's failure to acknowledge that it owed a primary duty to defend and indemnify Vitality, Plaintiff was required to pay for Vitality's defense in the Underlying Action and fully indemnify Vitality for the settlement. *Id.* at ¶¶ 29–30. Therefore, Plaintiff also seeks a money judgment against Allied "in an amount equal to what [Plaintiff] has incurred to defend and indemnify Vitality." *Id.* at ¶ 31.

The Allied Policy contains the following arbitration clause:

> **C. Arbitration.** All disputes or claims involving the Company shall be resolved by binding arbitration, whether such dispute or claim arises between the parties to this Policy, or between the Company and any person or entity who is not a party to the Policy but is claiming rights either under the Policy or against the Company. This provision is intended to, and shall, encompass the widest possible scope of disputes or claims, including any issues a) with respect to any of the terms or provisions of this Policy, or b) with respect to the performance of any of the parties to the Policy, or c) with respect to any other issue or matter, whether in contract or tort, or in law or equity. Any person or entity asserting such dispute or claim (the "Claimant") must submit the matter to binding arbitration with the American Arbitration Association, under the Commercial Arbitration Rules of the American Arbitration Association then in effect, by a single arbitrator in good standing. If the Claimant refuses to arbitrate, then any other party may, by notice as herein provided, require that the dispute be submitted to arbitration within fifteen (15) days. Neither the Claimant nor any other party shall have the right to participate as a member of any class of claimants, and there shall be no authority for any dispute to be decided on a class action basis. In

addition, an arbitration can only decide a dispute between the Claimant and the Company, and may not consolidate or join the claims of other persons who have similar claims. All procedures, methods, and rights with respect to the right to compel arbitration pursuant to this Article shall be governed by the Federal Arbitration Act. The arbitration shall occur in Orange County, California. The laws of the State of California shall apply to any substantive, evidentiary or discovery issues. Any questions as to arbitrability of any dispute or claim shall be decided by the arbitrator. If any party seeks a court order compelling arbitration under this provision, the prevailing party in such motion, petition or other proceeding to compel arbitration shall recover all reasonable legal fees and costs incurred thereby and in any subsequent appeal, and in any action to collect the fees and costs. A judgment shall be entered upon the arbitration award in the U.S. District Court, Central District of California, or if that court lacks jurisdiction, then in the Superior Court of California, County of Orange.

Dkt. 11, at 37.

## II.   LEGAL STANDARDS

On a motion to compel arbitration, courts "apply a standard similar to that applicable for a motion for summary judgment."[2] *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quotation mark and citation omitted). The court "considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks, alterations, and citation omitted).

---

[2] The Court evaluates Allied's motion to compel arbitration as a non-dispositive motion pursuant to 28 U.S.C. § 636(b)(1)(A). *See Cornelius v. Macy's Retail Holdings, Inc.*, No. 18CV678JLSJJM, 2021 WL 363973, at *2 (W.D.N.Y. Feb. 3, 2021), *appeal dismissed* (Apr. 23, 2021) ("[M]otions to compel arbitration are non-dispositive."); *Cumming v. Indep. Health Ass'n, Inc.*, No. 13-CV-969-A F, 2014 WL 3533460, at *1 (W.D.N.Y. July 16, 2014) ("The prevailing view among District Courts in this Circuit is that decisions to compel arbitration are non-dispositive.")

The Second Circuit "has established a two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002). Where parties "are bound to an arbitration agreement, courts are instructed to favor arbitration as a form of dispute resolution." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (citing 9 U.S.C. § 2). But on the antecedent question of "whether the parties actually agreed to arbitration (that is, whether an arbitration agreement between them exists at all), [the court] show[s] no such special solicitude." *Id.* Thus, "parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Associates, Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019). Instead, the court "resolve[s] such agreement-formation questions as [it] would most any contract dispute: by applying the law of the state at issue (which, as the parties here agree, is that of New York)." *Barrows*, 36 F.4th at 50; *accord Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Whether or not the parties have agreed to arbitrate is a question of state contract law."). And under New York law, "unsurprisingly, parties that have not agreed to arbitrate claims may not be forced to do so." *Barrows*, 36 F.4th at 50.

## DISCUSSION

## I.  AGREEMENT TO ARBITRATE

Allied seeks to compel Plaintiff's claims to arbitration pursuant to the arbitration clause in the Allied Policy. Dkt. 11. Both parties agree that Plaintiff did not sign the Allied Policy. *See* Dkt. 17, at 5; Dkt. 11, at 21. The Second Circuit, however, has made clear that "a nonsignatory party may be bound to an arbitration agreement if so dictated

by the 'ordinary principles of contract and agency.'" *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (citation omitted). There "are five theories 'for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'" *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (quoting *Thomson–CSF*, 64 F.3d at 776). Allied argues that Plaintiff is bound to the arbitration agreement under a theory of direct benefits estoppel. Dkt. 11, at 21–23.

### A. Estoppel Theory

Under the direct benefits theory of estoppel, "a nonsignatory may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement." *Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 631 (N.Y. 2013) (citing *MAG Portfolio*, 268 F.3d at 61). But "[w]here the benefits are merely 'indirect,' a nonsignatory cannot be compelled to arbitrate a claim." *Id.* The benefit derived from an agreement is indirect "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio*, 268 F.3d at 61. But the "mere fact of a nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is." *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 68 (2d Cir. 2021) (citation omitted).

The New York Court of Appeals has recognized that, "given the various nuances of contractual arrangements and that nonparties may derive some value from others'

agreements, it can be difficult to distinguish between direct and indirect benefits."

*Belzberg*, 21 N.Y.3d at 633.

> Under New York law, the guiding principle is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause. The mere existence of an agreement with attendant circumstances that prove advantageous to the nonsignatory would not constitute the type of direct benefits justifying compelling arbitration by a nonparty to the underlying contract.

*Id.*

### B. Parties' Arguments

The parties' arguments largely focus on whether Plaintiff's claims are grounded in contribution or subrogation. Allied argues that Plaintiff has knowingly exploited the Allied Policy by bringing this action. Dkt. 11, at 21–23. Allied contends that "[b]ut for the [Allied Policy], [Plaintiff] would have no claims directly against Allied" because "all declarations of duties and monies sought by [Plaintiff] in this matter depend entirely upon the existence of the [Allied] Policy and Allied's purported obligations thereunder to Vitality" as an additional insured. *Id.* at 23. Allied argues that Plaintiff's claims are therefore based on subrogation, because Plaintiff is "stepping into the shoes" of the mutual insured, Vitality, to assert Vitality's rights against Allied under the Allied Policy. According to Allied, "[i]n seeking indemnification of the entire sum Underwriters spent in defending and indemnifying Vitality, Underwriters have made clear that their second cause of action is one premised upon subrogation and not contribution." Dkt. 11, at 17 n.2.

In response, Plaintiff argues that it is not bound by the arbitration clause in the Allied Policy because it did not knowingly accept a direct contractual benefit from the Allied Policy. Dkt. 17, at 5. According to Plaintiff, it seeks "equitable and legal relief to

compel Allied to pay its fair share of defense and indemnification payments arising from the underlying action" and therefore its claims are based on a contribution theory that Plaintiff "paid a disproportionate share of Vitality's defense and indemnity." *Id.* at 6. Thus, Plaintiff is "merely exploiting Allied['s] contractual relationship with Goranova, which required Allied to defend and indemnify Vitality, and which then gave rise to [Plaintiff's] claims against Allied." *Id.* at 7.

### C. Plaintiff's Theory of Recovery

The Court disagrees that Plaintiff's claims are based on subrogation. Co-insurers "cannot recover from one another on a subrogation theory because they 'are not seeking reimbursement from a third-party wrongdoer.'" *Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466 F. Supp. 2d 533, 542 (S.D.N.Y. 2006) (quoting *Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 211 (2d Cir. 2000) ("[T]his case does not involve subrogation because the appellants are not seeking reimbursement from a third-party wrongdoer.")). Thus, "[c]laims seeking relief from a co-insurer . . . are 'not subrogation claims, but are instead firmly rooted in the well-settled principle in the law of contribution that when one party jointly liable on an obligation pays more than its pro rata share, it may compel the co-obligors to contribute their share of the amount paid.'" *Danaher Corp. v. Travelers Indem. Co.*, No. 10-CV-121 JPO, 2014 WL 7008938, at *9 (S.D.N.Y. Dec. 12, 2014) (quoting *Twin City Fire Ins. Co. v. Harel Ins. Co.*, No. 10 CV. 07842 BSJGWG, 2011 WL 3480948, at *4 (S.D.N.Y. Aug. 5, 2011) (quotation marks and citation omitted)).

However, the Court recognizes that Plaintiff's claims appear to differ from traditional contribution claims.[3] Plaintiff seeks to recover "an amount equal to what it has incurred to defend and indemnify Vitality and a declaratory judgment that "Allied breached its primary and non-contributory duty to defend and indemnify Vitality under the Allied Policy." Dkt. 1, at 5. Although "such claims bear similar roots to contribution claims, . . . claims between co-insurers do not sound precisely in contribution when they are not based on 'ratable or proportional reimbursement.'" *Tech. Ins. Co., Inc. v. Philadelphia Indem. Ins. Co.*, No. 21-CV-7387 (LJL), 2022 WL 17177852, at \*15 (S.D.N.Y. Nov. 23, 2022) (quoting *McDermott v. City of New York*, 50 N.Y.2d 211, 216 (N.Y. 1980)). "Nor does such a claim for payment between co-insurers sound in a 'third-party beneficiary' claim—even in light of an 'Other Insurance' provision in the co-insurers policy—in part because the plaintiff insurer is typically not 'named in [the co-insurer's] policy, nor was it within a class of intended beneficiaries of the policy.'" *Id.* (quoting *Vigilant Ins. Co.*, 466 F. Supp. 2d at 543).

Accordingly, "New York courts have described claims for payment between co-insurers that are not proportional or ratable, and are based on coverage for the same insured, as arising under the theory of recovery of implied indemnification." *Tech. Ins. Co.*, 2022 WL 17177852, at \*14 (citations omitted); *see McDermott*, 50 N.Y.2d at 216 ("The right to contribution is not founded on nor does it arise from contract and only ratable or proportional reimbursement is sought in an action for contribution. . . . The right to indemnity . . . springs from a contract, express or implied, and full, not partial,

---

[3] At oral argument, Plaintiff's counsel maintained that Plaintiff's claims are for contribution—whatever amount that may be after coverage and priority issues are resolved.

reimbursement is sought."); *Ins. Co. of N. Am. v. Historic Cohoes II*, 879 F. Supp. 222,

228 (N.D.N.Y. 1995) ("[Under] [c]ontribution . . ., the loss is distributed among the

tortfeasors as they are required to pay their proportionate share of the loss. Common

law indemnity, on the other hand, arises out of an implied-in-law contract, and the entire

loss is shifted from one party to another to prevent an unjust or unsatisfactory result.").

> Conceptually, implied indemnification finds its roots in the principles of
> equity. It is nothing short of simple fairness to recognize that (a) person who,
> in whole or in part, has discharged a duty which is owed by him but which
> as between himself and another should have been discharged by the other,
> is entitled to indemnity. To prevent unjust enrichment, courts have assumed
> the duty of placing the obligation where in equity it belongs.

*McDermott*, 50 N.Y.2d at 216–17 (citation and quotation marks omitted). Therefore,

"where payment by one person is compelled, which another should have made[,] a

contract to reimburse or indemnify is implied by law." *Id.* at 217.

Here, Plaintiff alleges that Vitality "qualifies as an insured or additional insured

under the Allied Policy[,]" but Allied wrongfully refused to defend and indemnify Vitality

in the Underlying Action. Dkt. 1, at ¶¶ 2, 23, 24. Due to "Allied's failure to acknowledge

that it owes a primary duty" to defend and indemnify Vitality in the Underlying Action,

Plaintiff was "required to pay for Vitality's defense" and "forced to fully indemnify

Vitality." *Id.* at ¶¶ 29, 30. Plaintiff alleges that it has "discharged a duty which is owed by

[it]"—defending and indemnifying Vitality in the Underlying Action—"but which as

between [it]self and [Allied] should have been discharged by [Allied]." *McDermott*, 50

N.Y.2d at 217. The Court therefore concludes that Plaintiff seeks reimbursement under

a theory of either contribution or implied indemnification. *See Tech. Ins. Co.*, 2022 WL

17177852, at *20 ("Here, [Plaintiff] sues under equitable principles that require co-

insurers of the same risk to assume responsibility (under an implied indemnification

theory) or share responsibility (under an equitable contribution theory) if the requirements for them to assume that risk have been triggered.").

     **D.**    **Plaintiff Cannot be Compelled to Arbitrate**

Unlike a subrogation action, Plaintiff cannot seek to directly enforce the Allied Policy because it is neither a party to that agreement, nor a third-party beneficiary.[4] The question remains whether, in seeking reimbursement from Allied pursuant to the Allied Policy, Plaintiff has received a direct benefit—even if it lacks the right to directly enforce the Allied Policy.

Defendant maintains that Plaintiff's alleged right to contribution or indemnification is a direct benefit. Allied emphasizes, and the Court recognizes, that Plaintiff's claims entirely depend on the terms of the Allied Policy. Plaintiff's claims rely on Allied's alleged duty to defend and indemnify Vitality in the Underlying Action, and this duty can only be determined by analyzing the relevant terms of the Allied Policy and Plaintiff's policy to resolve coverage and priority disputes. *See Vill. of Brewster v. Virginia Sur. Co.*, 70 A.D.3d 1239, 1242 (4th Dep't 2010) ("Turning to the issue of priority of coverage, we must review and consider the provisions of all of the relevant policies at issue to determine the priority among them.").

---

[4] The Allied Policy specifically provides that "there are no intended third-party beneficiaries by or under this Policy, unless such person or entity is specifically identified by name in this Policy." Dkt. 11, at 38 ¶ Q. Plaintiff is not named in the Allied Policy. *See id.* at 35; *see also RTM Cap. Partners, Inc. v. Barnes*, No. 3:21-CV-1462 (RNC), 2021 WL 5630019, at *9 (D. Conn. Dec. 1, 2021) (finding no evidence that either the plaintiffs or intervenor "were in any manner intended third party beneficiaries of any rights or obligations under the [Agreement] where the Agreement "expressly provided that '[n]o third party shall have any right under this Agreement'").

Yet, to be a "direct benefit," Plaintiff's right to contribution or indemnification must "flow[] directly from the [Allied Policy]" itself. *MAG Portfolio*, 268 F.3d at 61; *Kwatinetz v. Mason*, 356 F. Supp. 3d 343, 351 (S.D.N.Y. 2018) ("[T]he Second Circuit . . . has found benefits to be indirect when the nonsignatory had obtained benefits that did not flow from the agreement itself."). Under either a contribution or implied indemnification theory, Plaintiff's right to reimbursement does not flow directly from the Allied Policy, but rather from principles of equity. *See Md. Cas. Co.*, 218 F.3d at 211 (stating that, in contribution claims, "whatever rights the insurers have against one another *do not arise from contractual undertakings*" but rather "*flow from equitable principles*") (emphasis added); *McDermott*, 50 N.Y.2d at 216–17 (stating that "implied indemnification finds its roots in the principles of equity" such that "where payment by one person is compelled, which another should have made[,] *a contract to reimburse or indemnify is implied by law*") (emphasis added). Moreover, any right to recovery that Plaintiff may have against Allied depends not only on the terms of the Allied Policy, but also the terms of Plaintiff's policy with its insured. In the absence of Plaintiff's contractual relationship with the insured, it would have no right to recovery against Allied, regardless of the terms of the Allied Policy.

Relying on the principles of equity underlying contribution claims, the court in *Danaher* held that in seeking contribution, an insurer had not received a direct benefit from its insured's policies with other insurers because the benefits of those insurance policies flowed directly to the insured. 2014 WL 7008938, at *8–9.

> Industria and Trygg–Hansa contend that Travelers is bound by the arbitration clauses in their respective insurance policies covering Atlas Copco, although Travelers is not a party to those agreements. The Court disagrees. Travelers' cause of action against these insurers sounds in

12

contribution, under the "well-settled principle" that permits "one party jointly liable on an obligation [that] pays more than its pro rata share [to] ... compel the co-obligors to contribute their share of the amount paid." *Md. Cas. Co. v. W.R. Grace & Co.,* 218 F.3d 204, 210 (2d Cir. 2000). Travelers, in seeking contribution, did not knowingly accept a direct benefit of Trygg–Hansa's and Industria's insurance contracts with Atlas Copco. The benefit of these insurance policies ran to Atlas Copco, the insured party. Instead, the interest that Travelers seeks is an "indirect" one, because rather than "flowing directly from the agreement," it "exploits the contractual relation" between the insurers and Atlas Copco that may require Trygg–Hansa and Industria to defend or indemnify Atlas Copco against certain claims—which, in turn, may give rise to a contribution claim by Travelers.

*Id.*

The Court finds the reasoning in *Danaher* persuasive.[5] To be bound under direct benefits estoppel, the nonsignatory beneficiary "must actually invoke the contract to obtain its benefit, or the contract must expressly provide the beneficiary with a benefit." *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020). The Allied Policy does not expressly provide Plaintiff with a benefit. Nor can Plaintiff directly enforce the Allied Policy through a breach of contract action because it is neither a party

---

[5] Plaintiff's contention that "[b]ut for the Policy, [Plaintiff] would have no claims directly against Allied" does not change this analysis. Dkt. 11, at 23. "Even if the 'agreement was crucial to the benefit the third party gained,' the third party cannot be estopped if the benefit stems 'from the nonsignatory's exploitation of the contractual relation created through the agreement' rather than from the agreement itself." *Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*, 203 F. Supp. 312, 323 (S.D.N.Y. 2016) (citations omitted); *see MAG Portfolio*, 268 F.3d at 62 ("While the agreement was crucial to the benefit the third party gained by shutting its competitor out of the market, the agreement was not the direct source of the benefit."); *Danaher*, 2014 WL 7008938, at *8 ("[T]he benefit to the plaintiff flowed from a source separate from the underlying contract, even if the contract was a but-for cause of that benefit."). While Plaintiff also cites *Scottsdale Ins. Co. v. Kinsale Ins. Co.*, that court found *Danaher* inapplicable because Scottsdale's claims involved equitable subrogation, rather than contribution. 253 F. Supp. 796, 803 (E.D. Pa. 2017). Moreover, the court in *Scottsdale* acknowledged that there was no evidence "that Scottsdale received 'any <u>direct</u> benefit' from [the] agreement." *Id.*

to the Allied Policy, nor a third-party beneficiary.[6] Therefore, by suing Allied for contribution or indemnity pursuant to the terms of the Allied Policy, Plaintiff has not "actually invoke[d]" the Allied Policy to obtain a direct benefit. *Id.*

In *Trina Solar*, Jasmin—an Australian company that provided solar power equipment and installation—"sought to exploit a favorable government-backed solar power rebate program in Queensland, Australia that was soon set to expire." 954 F.3d at 569. Jasmin "began to negotiate a contract . . . with the United States-based division of Trina, a Chinese solar panel manufacturer, to buy Trina's solar panels. *Id.* Jasmin "authorized JRC, a Nevada-based company, to act as Jasmin's agent for all business dealings between Jasmin and Trina[.]" *Id.* Jasmin "communicate[d] with Trina regarding delivery schedules and credit line issues and to review purchase orders prior to delivery. In addition, Jasmin confirmed that it would pay the invoices for the solar panels delivered to JRC." *Id.* Yet, the Second Circuit held that Jasmin was not estopped from avoiding the contract's arbitration clause. *Id.* at 573.

---

[6] Allied cites *Best Concrete Mix Corp. v. Lloyd's of London Underwriters,* 413 F. Supp. 2d 182, 186–88 (E.D.N.Y. 2006) and *Int'l Chartering Servs., Inc. v. Eagle Bulk Shipping Inc.*, 138 F. Supp. 3d 629, 633 (S.D.N.Y. 2015), but those cases are distinguishable. In *Best Concrete*, "the court held that a plaintiff company that was not a signatory to an insurance agreement—but was *itself* an 'additional insured' under the agreement—was bound to arbitrate, because the company was seeking '*to avail itself of the protection and direct benefits afforded by the policy.*'" *Danaher*, 2014 WL 7008938, at *8 n.8 (quoting *Best Concrete*, 413 F. Supp. 2d at 187). Here, "[t]here is no claim that [Plaintiff] is insured pursuant to the [Allied] polic[y]" and the Court rejects Allied's argument that "[Plaintiff's] action is an attempt to claim directly on that insurance, so *Best Concrete* . . . [is] inapt." *Id.* Additionally, in *Int'l Chartering*, the court held that the plaintiffs—who sought to recover commission payments under contracts that they were not signatories to—were seeking a "direct benefit" under those contracts. 138 F. Supp. 3d at 635. In that case, however, plaintiffs brought a breach of contract claim and did not "seriously dispute that they [were] third-party beneficiaries." *Id.* at 637. Thus, as in *Best Concrete*, the plaintiffs there sought to recover payment by directly claiming on the contracts at issue.

Here, Jasmin surely benefited from the contractual relationship between Trina and JRC, as it ultimately received solar panels sold by Trina to JRC. But there is no record evidence that Jasmin ever invoked the Contract to demand delivery of the solar panels, and the Contract itself does not provide Jasmin any direct benefit. Nor did Jasmin, on this record, ever invoke Trina's duties under the Contract to seek or obtain a benefit. To the contrary, as we have noted, the Contract explicitly provides that "[n]othing in th[e] Contract is intended to confer on any person who is not a party hereto any right to enforce any term of this Contract." Appellant's App'x 41. Because Jasmin was not a party to the Contract, as explained above, it could not enforce any rights or duties under the Contract. For these reasons, we conclude, the District Court erred when it determined that Jasmin was estopped from avoiding the Contract's arbitration clause.

*Id.* at 572–73.

Like Jasmin in *Trina Solar,* Plaintiff "surely benefitted from the contractual relationship between" Allied and Vitality because that contractual relationship and Allied's respective duties under it form the basis of Plaintiff's claims. *Id.* at 573. Moreover, the Allied Policy itself did not "provide [Plaintiff] any direct benefit." *Id.* at 572–73. At first glance, it appears that Plaintiff is invoking Allied's duties under the Allied Policy to obtain a benefit—namely contribution or indemnification for the settlement in the Underlying Action. Indeed, Plaintiff seeks a "judgment declaring that Allied breached its primary and non-contributory duty to defend and indemnify Vitality under the Allied Policy." Dkt. 1, at ¶ 31. But in holding that Jasmin had not invoked Trina's duties under the contract, the Second Circuit noted that "[b]ecause Jasmin was not a party to the Contract, . . . it could not enforce any rights or duties under the Contract." 954 F.3d at 569. The same reasoning applies here. Plaintiff cannot "actually invoke" Allied's alleged duties to Vitality under the Allied Policy because Plaintiff lacks the right to "enforce any rights or duties under [the Allied Policy]." *Id.*; *see Lang v. First Am. Title Ins. Co.*, No. 12-CV-266S, 2012 WL 5221605, at *5 (W.D.N.Y. Oct. 22, 2012) ("[B]ecause Plaintiffs

15

could not bring a breach of contract claim based on the provisions of the lender title policy, it cannot be said that they are now exploiting a term of that agreement."). Thus, principles of equity allow for a contribution or indemnification claim *because* Plaintiff has no direct rights under the Allied Policy. [7]

-------------------------------------------------------------------

[7] Courts also consider a nonsignatory's reliance on the agreement in pursuing its claims. *See Lang*, 2012 WL 5221605, at *5 ("Nor do Plaintiffs need to rely on any provision of the lender title policy to establish a claim . . . ."). Reliance on the terms of the agreement, however, is not in itself sufficient to estop a nonsignatory from avoiding arbitration under New York law. *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 649–50 (1st Dep't 2012) ("[T]he benefits must be direct, *and* the party seeking to compel arbitration must demonstrate that the party seeking to avoid arbitration relies on the terms of the agreement containing the arbitration provision in pursuing its claim.") (emphasis added); *Belzberg*, 21 N.Y.3d at 633–34 (N.Y. 2013) ("[A]bsent the nonsignatory's reliance on the agreement itself for the derived benefit, the theory would extend beyond those who gain something of value as a direct consequence of the agreement."). The Fifth Circuit has held that a nonsignatory may be estopped from avoiding an arbitration clause "(1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or *asserting claims that must be determined by reference to that contract*." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) (emphasis added). While Plaintiff's claims here must be determined by reference to both the Allied Policy and Plaintiff's policy, the Second Circuit has not explicitly adopted the latter standard. Moreover, in the case cited for that principle, the "very nature of the claim brought require[d] that [the defendant's] performance under the contract be for [the plaintiff's] benefit." *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 519 (5th Cir. 2006) ("Having stated a claim that expressly requires that DNV's performance be for Hellenic's benefit, Hellenic cannot avoid the estoppel implications of its position."). The Second Circuit has recognized an alternate estoppel theory in which "a court will 'estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed,' and the signatory and nonsignatory parties share a close relationship." *MAG Portfolio*, 268 F.3d at 62 (quoting *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)). However, "because arbitration is guided by contract principles, the reverse is not also true" and this theory is therefore inapplicable to the case at hand. *Id.*; *see Thomson-CSF*, 64 F.3d at 780 (holding that district court "improperly extended the limited theories upon which this Court is willing to enforce an arbitration agreement against a nonsignatory" by applying alternate estoppel theory when *signatory* sought to compel arbitration); *see also Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 CIV. 9050 (LMM), 2009 WL 2031855, at *10 (S.D.N.Y. July 8, 2009) ("The holdings in *Thomson–CSF* and *MAG Portfolio* expressly disapprove of compelling a non-signatory to arbitrate under this alternative estoppel theory.").

In sum, "[w]hile the [Allied Policy] was crucial to the benefit [Plaintiff] gained by [seeking reimbursement from Allied], the agreement was not the *direct source* of the benefit." *MAG Portfolio*, 268 F.3d at 62 (emphasis added). The "benefit of [Allied Policy] ran to [Goranova/Massage-Envy], the insured party. Instead, the interest that [Plaintiff] seeks is an 'indirect' one, because rather than 'flowing directly from the agreement,' it 'exploits the contractual relation' between the [Allied] and [Goranova/Massage-Envy] that may require [Allied] to defend or indemnify [Vitality] against certain claims." *Danaher*, 2014 WL 7008938, at *8 (citations omitted). Accordingly, as a nonsignatory to Allied Policy, Plaintiff cannot be compelled to arbitrate under a direct benefits estoppel theory.

## **CONCLUSION**

For these reasons, Allied's motion to compel arbitration and stay proceedings, or in the alternative, motion to transfer the case (Dkt. 11) is DENIED.

**SO ORDERED.**

**DATED:**      **July 11, 2023**
            **Buffalo, New York**

                    *s/ H. Kenneth Schroeder, Jr.*
                    **H. KENNETH SCHROEDER, JR.**
                    **UNITED STATES MAGISTRATE JUDGE**